**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**PAMPA REGIONAL MEDICAL CENTER**
1 Medical Plaza
Pampa, TX 79065

**KNAPP MEDICAL CENTER**
1401 East Eight Street
Weslaco, TX 78596

**MISSION REGIONAL MEDICAL CENTER**
900 South Bryan Road
Mission, TX 78572

**DALLAS MEDICAL CENTER**
7 Medical Parkway
Dallas, TX 75234

**DALLAS REGIONAL MEDICAL CENTER**
1011 North Galloway Avenue
Mesquite, TX 75149

**HARLINGEN MEDICAL CENTER**
5501 South Expressway 77
Harlingen, TX 78550

Plaintiffs,

v.

**ROBERT F. KENNEDY, JR.**, In his Capacity as
Secretary of the U.S. Department
of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

Defendant.

Case No.

**COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT**

## INTRODUCTION

1. This civil action is brought by Pampa Regional Medical Center, Knapp Medical Center, Mission Regional Medical Center, Dallas Medical Center, Dallas Regional Medical Center, and Harlingen Medical Center (hereinafter "Plaintiffs," "Providers," or "Plaintiff Hospitals") against the Secretary for the United States Department of Health and Human Services (the "Secretary" of "HHS")[1] for judicial review of a final decision rendered on July 7, 2026 by the Provider Reimbursement Review Board ("PRRB" or "Board"), a component of HHS. Judicial review is sought arising from the Board's dismissal of PRRB Case No. 24-2269GC. The basis for this lawsuit is the Secretary's willful refusal to follow clear, unambiguous federal law as well as its own rules.

Plaintiff Hospitals specifically challenge the Secretary's dismissal of their administrative appeal, issued through his administrative adjudicatory tribunal, the Provider Reimbursement Review Board ("PRRB" or "Board") and occasioned by that Board's dismissal of Plaintiffs' administrative appeal before the matter could properly be heard and adjudicated before the Board. The facts make clear that the Board's rationale for issuing its dismissal was based upon its's arbitrary and capricious decision making process. That is to say, the Board precipitated what it termed to be Plaintiffs' untimely electronic filing of certain preliminary documents by its own shortcomings; it published a revision to one of its Rules that had previously set forth well established procedures for filing, yet failed to appropriately notice that revision to Medicare hospitals, including Plaintiffs. In view of the Board's abrupt and punitive conduct, the key substantive issue of the appeal, to wit: the Medicare Administrative Contractor's ("MAC") refusal to include all Medicaid eligible days**, including section 1115 waiver days** in the Medicaid

[1] The Secretary is the proper Defendant in this appeal. *See* 42 C.F.R. § 405.1877(a)(2).

Fraction computation for the cost year at issue in this case (fiscal year end, hereinafter "FYE,") 2020 was never brought forth to an adjudicative proceeding, thus depriving each Plaintiff Hospital its rights to such a hearing, one which should have precipitated additional Medicare reimbursement payment to each hospital as prescribed by the Medicare Act.

2. This timely action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395 *et seq.* (the "Medicare Act"), 5 U.S.C. §§ 706 *et seq.* (the Administrative Procedure Act or "APA"), 28 U.S.C. § 1361 (mandamus), and other authorities. The Medicare payments here pertain to how inpatient hospital days should be counted for purposes of calculating Plaintiff Hospitals' Medicare Disproportionate Share Hospital ("DSH") payments for the fiscal year ("FY") ending 2020.

3. The Board's final decision, its dismissal of Plaintiff Hospitals' group appeal, was noticed by letter dated July 7, 2026 (dismissal notice attached as **Exhibit A**). Plaintiffs' appeal alleges that the Secretary and the MAC refused to follow the clear dictates of the Centers for Medicare & Medicaid Services ("CMS") Manual Instructions System, Change Request 12669, Transmittal No. 11912 (March 16, 2023) (attached as **Exhibit B**), which provides an independent legal basis, mandamus, for this action. In response to the Board's dismissal of Plaintiffs' appeal, Plaintiffs submitted to the Board on July 9, 2026 a timely filed Request for Reconsideration of its dismissal as well as a request to reinstate their appeal (attached as **Exhibit C**). Despite the good cause shown by Plaintiffs, the request was subsequently denied by the Board by letter dated August 3, 2026. (attached as **Exhibit D**)

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 42 U.S.C. § 1395oo(f) (appeal of final Medicare program agency decision), 28 U.S.C. §§ 1331 (federal question), and 1361 (mandamus). *See*

*Heckler v. Ringer*, 466 U.S. 602, 616-17 (1984); *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807,811, 813-15 (D.C. Cir. 2001); *United States v. Monzel*, 641 F.3d 528, 534 (D.C. Cir. 2011). Jurisdiction also is available under 28 U.S.C. § 1331 where the agency renders a final determination for which there is no administrative appeal available. *Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005).

5. Venue lies in this district pursuant to 42 U.S.C. § 1395oo(f)(1) and 28 U.S.C. § 1391(e)(1).

**PARTIES**

6. Each named Plaintiff herein had at all relevant times a Medicare provider agreement and was eligible to participate in the Medicare program. At all times during the relevant time periods pertinent to this complaint, each named Plaintiff furnished inpatient and outpatient hospital services to Medicare patients.

7. Defendant has offices at 200 Independence Avenue, SW, Washington DC 20201 and is the federal officer responsible for the administration of the Medicare program. As such, Defendant Kennedy, Jr. is sued in his official capacity as Secretary of Health and Human Services.

**GENERAL BACKGROUND OF THE MEDICARE PROGRAM**

8. The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease. 42 U.S.C. § 1395c. The Medicare program is federally funded and administered by the Secretary through CMS and its contractors. 42 U.S.C. §1395kk(a); 42 Fed. Reg. 13,262 (Mar. 9, 1977). CMS implements the Medicare program, in part, through rulemaking. *See* 42 C.F.R. § 401.108. In addition to the substantive rules published by the Secretary in the Code of Federal Regulations and the Rulings, CMS publishes other interpretative rules implementing the Medicare program, which are usually compiled in CMS manuals. The

Secretary also issues other sub-regulatory guidance which generally do not have the force and effect of law. This civil action involves Medicare Part A. Part A provides coverage and payment for, among others, inpatient hospital services on a fee-for-service basis. 42 U.S.C. §§ 1395c to 1395i-6. Such items/services are furnished to Medicare beneficiaries by providers of services, including hospitals, that have entered into written provider agreements with the Secretary pursuant to 42 U.S.C. § 1395cc. Providers are paid (reimbursed) by CMS through MACs. *See* 42 U.S.C. §1395kk-1(a).

9. Each Medicare-participating hospital is assigned to a MAC. 42 U.S.C. § 1395kk-1(a)(3)(B). The amount of Medicare Part A payment owed to a hospital for services furnished to Medicare beneficiaries is determined by its MAC based on instructions from CMS. *See* 42 C.F.R. § 405.1803.

10. Effective with cost reporting years beginning on or after October 1, 1983, hospitals are reimbursed under the Hospital Inpatient Prospective Payment System ("IPPS") for inpatient hospital operating costs. *See* 42 U.S.C. § 1395ww(d). Under IPPS, Medicare payments for hospital operating costs are not based directly on the costs actually incurred by the hospitals. Rather, they are based on predetermined, nationally applicable rates based on the diagnosis of the patient determined at the time of discharge from the inpatient stay, subject to certain payment adjustments. *See id.* One of these adjustments is the Medicare DSH payment. *See* 42 U.S.C. § 1395ww(d)(5)(F).

11. Congress enacted the DSH adjustment in recognition of the relatively higher costs associated with providing services to low-income patients. These higher costs have been found to result in part from the poorer health of those patients. The DSH adjustment provides additional Medicare reimbursement to hospitals for the increased cost of providing such services.

12. Hospitals that treat a disproportionately large number of low-income patients are entitled by statute to a DSH adjustment, in addition to standard Medicare payments. 42 U.S.C. §1395ww(d)(5)(F). The DSH program was in effect beginning with discharges on or after May 1, 1986. Pub. L. No. 99-272, § 9105, 100 Stat. 158-60 (Apr. 7, 1986).

13. There are two methods of determining qualification for a DSH adjustment: the more common "proxy method" and the less common "Pickle method." See 42 U.S.C. §1395ww(d)(5)(F)(i)(I)-(II). Plaintiff Hospital's DSH calculations at issue were made using the proxy method, under which entitlement to a DSH adjustment, as well as the amount of the DSH payment, is based on a hospital's disproportionate patient percentage (hereinafter, "DPP"). 42 U.S.C. § 1395ww(d)(5)(F)(v)-(vi).

14. The DPP is the sum of two fractions, which are designed to capture the number of low-income patients a hospital serves on an inpatient basis by counting the number of days that low-income patients receive inpatient services in a given fiscal year ("inpatient days"). 42 U.S.C. § 1395ww(d)(5)(F)(vi). Thus, the two fractions serve as a "proxy" of a hospital's low-income patients, rather than having CMS count the actual number of those patients.

15. The first fraction, referred to as the "Medicare Fraction," accounts for inpatients who are current Medicare Part A recipients whilst *also* being entitled to Supplemental Security Income ("SSI") benefits, a federal low-income supplement. The Medicare Fraction is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter[.]

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The Medicare Fraction, therefore, is the percentage of a hospital's Medicare Part A-entitled inpatients who were also entitled to SSI benefits at the time that they were receiving inpatient services at the hospital.

16. The second fraction, referred to as the "Medicaid Fraction," is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

17. The Medicaid Fraction, therefore, is intended to account for hospital inpatients "…who were not entitled to benefits under [Medicare] [P]art A," who were "…eligible for medical assistance…" under the Medicaid State plan at the time that they were receiving inpatient services at the hospital. The Medicaid Fraction is at issue in this case.

18. The statute further provides for purposes of determining the Medicaid Fraction "…the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI." 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). Patient days of patients who receive benefits under a demonstration project approved under subchapter XI of the Social Security Act are commonly referred to as "section 1115 waiver days" (because of the Secretary's waiver or demonstration project authority under section 1115 of the Social Security Act). The Secretary's non-inclusion of section 1115 waiver days in Plaintiff Hospital's Medicaid Fraction for its 2017 fiscal cost year is at the heart of

this action. As discussed, *infra.,* section 1115 waiver days *are* in fact Medicaid **eligible** days, and need not be distinguished from any and all other Medicaid **eligible** days when presenting an appealable issue before the Board. (and *see, e.g., Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32 (D.D.C. 2019), *aff'd*, 980 F.3d 121, 122 (D.C. Cir. 2020) and CMS Change Request 12669, Transmittal No. 11912 (March 16, 2023). (Ex. B at 3).

**THE RELEVANT MEDICARE APPEALS PROCESS**

19. At the close of its fiscal year ("FY"), a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. § 413.20. For Medicare, each hospital's MAC is required to analyze and audit the hospitals annually submitted Medicare cost report and issue a Medicare Notice of Amount of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year. 42 C.F.R. §405.1803. In addition to including costs on its cost report, a hospital also is required to make a claim, or alternatively self-disallow, for any modification to its basic IPPS payment adjustment, such as the DSH adjustment.

20. The Medicare Act provides that if a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in its NPR, and the hospital satisfies the amount in controversy requirements (not an issue in this case), the hospital has a right to obtain a hearing before the PRRB by filing an appeal within 180 days of receiving its NPR (or any revised NPR). 42 U.S.C. § 1395oo(a). The statute allows a hospital that is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of 42 U.S.C. § 1395ww

to obtain a PRRB hearing by requesting the hearing within 180 days after notice of the Secretary's final determination. 42 U.S.C. § 1395oo(a)(1)(A)(ii), (a)(3).

21. The regulations interpret the statutory requirements by stating that "…the date of receipt by the Board of the provider's hearing request must be no later than 180 days after the date of receipt by the provider of the final contractor or Secretary determination." 42 C.F.R. § 405.1835(a)(3).

22. In addition to having the authority to make substantive decisions concerning Medicare reimbursement appeals, the PRRB is authorized to decide questions relating to its jurisdiction and procedure. The decision of the PRRB on substantive or jurisdictional issues constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision. 42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§ 405.1875 and 405.1877. The Secretary has delegated authority under the statute to review PRRB decisions to the CMS Administrator. Thus, the Secretary's final administrative decision for purposes of judicial review is either the decision of the PRRB or the decision of the CMS Administrator after review of the PRRB's decision.

23. A hospital may obtain judicial review by filing suit in the U.S. District Court for the judicial district in which the hospital is located within 60 days of receipt of the Secretary's final administrative decision. 42 U.S.C. §1395oo(f)(1). Pursuant to 42 C.F.R. §405.1801(a)(1)(iii), the date of receipt by a party involved in proceedings before the PRRB is presumed to be five days after the date of issuance of a PRRB document.[2] As such, the deadline in this case to seek judicial review is September 5, 2026. This filing is therefore timely.

[2] Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded in favor of the prevailing party in an action brought under 42 U.S.C. § 1395oo(f). Under 42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare providers, if the underpayment is not paid within 30 days of a "final determination."

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

24. Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review of final agency action involving PRRB appeals "...shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the APA. Under the APA, a "...reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Further, a "...reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute[.]" 5 U.S.C. § 706(2)(E).

## LITIGATION OVER SECTION 1115 WAIVER DAYS AND THE SECRETARY'S ACQUIESCENCE IN FIFTH AND D.C. CIRCUIT DECISIONS

25. In *HealthAlliance Hospitals v. Azar*, 346 F. Supp. 3d 43 (D.D.C. 2018), the Court rejected the Secretary's assertion that for hospital days under a section 1115 waiver to be included in the Medicaid Fraction, the terms of waiver agreement between the State Medicaid agency and the Secretary must contain an explicit statement that patients covered by the waiver are "…eligible for inpatient hospital services." *See id.* at 46. That Court disagreed. *See id.* at 46-47. According to the *HealthAlliance* court:

> [i]t is clear from the plain language of the regulation's text [at 42 C.F.R. § 412.106(b)(4)(i)] that patients who are eligible to receive comprehensive medical care through an insurance program authorized under a section 1115 waiver (as evidenced by their eligibility for inpatient hospital services) are to be included in the Medicare reimbursement formula, and whether or not the waiver agreement through which the Secretary authorized the program *says* anything about their eligibility for inpatient hospital services is irrelevant to the calculation of a hospital's disproportionate share hospital adjustment.

*Id.* at 47. This remains true in this dispute.

26. A similar issue was presented in *Forrest General Hospital v. Azar*, 926 F.3d 221 (5th Cir. 2019). The Secretary claimed an uncompensated care pool related to Hurricane Katrina was not part of a section 1115 waiver. *See id.* at 232. In disagreeing, the Fifth Circuit found the

> …excellent opinion in *HealthAlliance Hospitals, Inc. v. Azar* extremely persuasive. That opinion convincingly explains why the law governing the inclusion of section 1115 waiver patient days in the Medicaid fraction is straightforward: the plain regulatory text demands that such days be included—period.

*Id.* at 234 (citations omitted). The Fifth Circuit also held that the statute was unambiguous and noted with respect to 42 C.F.R. § 412.106(b)(4) that, "[w]hat does *not* matter for purposes of this regulation is what the plan documents say about eligibility for particular services." *See Forrest General at* 228-229. Following *Forrest General*, the Secretary continued to litigate, and lose, the issue whether days associated with patients who were covered under a section 1115 waiver that included an uncompensated care pool, and which did not specifically mention inpatient hospital benefits, should be included in the Medicaid Fraction. *See, e.g., Bethesda Health, Inc. v. Azar*, 389 F. Supp. 3d 32 (D.D.C. 2019), *aff'd*, 980 F.3d 121, 122 (D.C. Cir. 2020).

27. As a result of those losses, CMS issued guidance acquiescing to the Fifth Circuit and D.C. Circuit decisions. (*See* Ex. B). The manual instructions provide that upon a hospital submitting a listing of its section 1115 waiver days, the hospital's MAC must do the following:

> [f]or cost reports that are open via a [] (PRRB) appeal that has not yet been heard before the PRRB, [s]ection 1115 days will be reviewed through the normal Administrative Resolution process within 24 months of the CR implementation date. In order for the Medicare Administrative Contractor (MAC) to consider the providers' Section 1115 days in recalculation of the Medicaid fraction, the following review shall take place, only as deemed necessary by the Uniform Desk Review process or Administrative Resolution process:
>
> 1. For providers with patients whose inpatient stay is covered by a Section 1115 waiver program funding pool, which pays health care providers that provide uncompensated care to patients who are uninsured or underinsured and is matched by Title XIX federal funds, the MAC shall review the State's Section 1115 program

> documents to determine the method by which the provider identifies eligible inpatient stay days.
>
> 2. The MAC shall select a sample of accounts from the provider's submitted Section 1115 log for further review.
>
> 3. The MAC shall request documentation from the provider for the selected sample and review the documentation to ensure that: a) the provider has accurately included the inpatient stay in the Section 1115 waiver program for reimbursement through the funding pool based on the provider's Section 1115 approved program documents; and b) has accurately included the inpatient stay on the Section 1115 log.
>
> 4. The MAC shall review the provider's applicable documentation that details the patient's length of stay and the acute-care unit that the patient's stay occurred to verify the patient's length of stay in an inpatient acute section of the hospital.

(*Id* at 4).

28. In the FY 2024 IPPS rulemaking, the Secretary proposed and finalized new and restrictive regulations on including section 1115 waiver days in the Medicaid Fraction; however, these regulations are prospective only. *See* 88 Fed. Reg. 58,640, 59,017 (Aug. 28, 2023) ("Finally, we are finalizing as proposed that our revised regulation would be effective for discharges occurring on or after October 1, 2023").

**SPECIFIC FACTS PERTAINING TO THIS CASE**

29. Subsequent to the MAC's issuance of NPRs to each individual Plaintiff Hospital for their cost year ending FY 2020, on August 13, 2024 the Board received Plaintiffs' group appeal request, appealing their DSH adjustment. Specifically, and upon the creation of the **CIRP Group** appeal, Plaintiffs timely appealed the MAC's non-inclusion of Medicaid eligible days, stating that:

> "The MAC's failure to include in the Medicaid Fraction numerator days attributable to patients who received care under an approved section 1115 waiver program was clearly inconsistent with the law and regulations, namely, § 1886(d)(5)(F)(vi)(II) of the Act and 42 C.F.R. § 412.106(b)(4). Since the Program's uncompensated care pool was established under a CMS-approved Section 1115 waiver, the days attributable to patients who received

> care for which the Providers received reimbursement from the uncompensated care pool must be included in the numerator of the Medicaid Fraction. The MAC, therefore erred in excluding those days from the Medicaid Fraction numerator of the DSH adjustment for the Providers, and an adjustment of these cost reports is required for compliance with law." (attached as **Exhibit E** and *see,* at p. 3).

To clarify the timing of each issued NPR per hospital, and the timely filing of each Provider appeal into the formed CIRP Group appeal, a table is presented, below:

| Plaintiff Hospital | Medicare Provider # | Issuance date of NPR | Appeal submission |
|---|---|---|---|
| Pampa Regional Medical Center | 45-0099 | 03/28/2024 | 09/24/2024 |
| **Knapp Medical Center** | **45-0128** | **11/12/2025** | **04/23/2026** |
| Mission Regional Medical Center | 45-0176 | 02/22/2024 | 08/13/2024 |
| Dallas Medical Center | 45-0379 | 02/29/2024 | 08/15/2024 |
| Dallas Regional Medical Center | 45-0688 | 08/06/2024 | 01/28/2025 |
| Harlingen Med Center | 45-0855 | 03/22/2024 | 09/18/2024 |

30. On August 14, 2024, the Board issued an *Acknowledgement & Critical Due Dates* ("ACDD") stating that: "[u]pon full formation of the group appeal, the Board *will issue a* **Critical Due Dates** Notice to establish deadlines for the submission of jurisdictional comments and the preliminary position papers/proposed joint scheduling order." *supra* (emphasis added)

31. On July 31, 2025 Plaintiffs, by and through its representative, Healthcare Reimbursement Services ("HRS") timely responded to Full Formation Comments indicating that the CIRP group was not yet complete, as it was awaiting the addition of one more provider.

32. On April 23, 2026, HRS added the last participant to the Group (Knapp Medical Center, marked bold in the table, *supra*) and appropriately designated the CIRP Group to now be fully formed.

33. On May 5, 2026, the Board issued the "**Group Completion Notice**" which set the deadlines for its Rule 20 Certification/Schedule of Providers ("Rule 20/SoP"), as well as the Parties' Preliminary position papers. The Rule 20/SoP deadline was set for June 22, 2026.

34. On July 7, 2026, and having not yet received the documentation by the Rule 20/SoP deadline date of June 22, 2026, the Board dismissed Plaintiffs' Group appeal case in its entirely.

35. On July 9, 2026, Plaintiffs' representative filed a "Request for Reconsideration" in which it requested the Board set aside its dismissal and reinstate the appeal and therein included a Rule 20 Certification. Noteworthy, the representative explained that it was "awaiting the Board's aforementioned **Critical Due Dates** notice" which the Board had previously represented in its earlier August 14, 2024 letter (Exhibit D) that it would provide to Plaintiffs upon notification that the CIRP Group appeal had fully been formed.

a. Plaintiffs missed the aforementioned Board-imposed deadline as they were awaiting the Board's issuance of its customary Critical Due Dates Notice

36. The facts which give rise to the instant complaint are not complex but are instead straightforward: As noted, above, the Board specifically represented to Plaintiffs that it would issue its Critical Due Dates notice upon notification that Plaintiffs' CIRP Group appeal was 'fully formed." There is no argument whatsoever that Plaintiffs notified the Board, in its April 23, 2026 letter that the last participant in the group had been added and that the group was therefore, 'fully formed." *supra* at 1. As such, Plaintiffs' representative had all the reason to anticipate that it would soon receive the Board's anticipated "Critical Due Dates" notice. Plaintiffs'. At the

time, Plaintiffs' representative HRS had been conducting consulting services to DSH hospitals like Plaintiffs herein for decades; the leaders of HRS knew the Board rules well and were always particularly focused not only upon existing Board rules, but *each and every* **noticed** modification to the language and requirements to any of its rules.

37. So it was to HRS's complete astonishment when it received the Board's July 7, 2026 appeal dismissal letter (Ex. A) with its explanation that had, "… failed to meet the Rule 20/SoP deadline."

38. In response to the notice of dismissal, HRS immediately filed a "Request for Reconsideration", explaining among other factors that it had, as was customary under Board rules, been "…awaiting the Board's Critical Due Date email so that the document [Board Rule 20 Certification] could be uploaded through the (Case Action) tab, rather than utilizing the "Other" filing function. The difficulty encountered by HRS was occasioned chiefly by the fact that given the modification to the Board rules in or about December, 2025, a twelve-day period separated HRS's receipt of the Critical Due Date email and HRS's earlier entry in the Board portal that the CIRP Group had been fully formed. The critical Due Date email issued by the Board was not received by HRS until twelve days after HRS had entered a mark at the Board portal that the CIRP Group was "fully formed". In view of the Board's new procedure and having not yet incorporated the change into its filing process, HRS had, by the time it received the CDD email twelve days after it notified the Board at the portal that the Group had been fully formed, erroneously believed that it had already uploaded the Rule 20 certification at the time of that earlier notification. The standard procedure for HRS up to that to that time and prior to the Board's rule modification was to enter the Board portal, mark the Group as "fully formed" and upload the Rule 20 certification simultaneously. Given the modified rule, and upon receiving the CDD email it had mistakenly

believed that it had already provided the Rule 20 certification, *supra.* Upon receiving the Board's Notice of Dismissal, HRS uploaded/attached the requisite Certification to the Request for Reconsideration of the Board's dismissal, HRS made certain to inform the Board that its missing of the deadline to file the Certification was occasioned because it was, "[w]aiting for the Board's [customary] Critical Due Date (CDD) email so that the Board Rule 20 certification document could be uploaded through the Case Action tab, rather than utilizing the "Other" filing function which HRS felt could confuse the Board as to the precise meaning of the filing " (*see,* Exhibit B)

39. Plaintiffs, by and through its representative, HRS also made clear in its "Request for Reconsideration" letter of July 9, 2026 that this methodology employed by the Board for the uploading of essential documents was, "…[a] relatively new procedure that was implemented [by the Board] for new critical dates issued beginning in December [2025]." *Id.*

40. Most critically, HRS pointed out in the July 9 request letter that, "…no formal notice, guidance, or instructions regarding this change were provided by the Board." HRS advanced the notion that the firm had thus modified its operational process associated with this new filing procedure going forward.

41. The ultimate remedy of the Board to the alleged failure of Plaintiff Hospitals to file a timely Rule 20 Certification was a dismissal of their CIRP Group appeal. The appropriateness of the Board's imposed remedy, however, had two significant obstacles to overcome, and in retrospect, failed quite miserably to overcome either.

/ / / /

/ / / /

/ / / /

/ / / /

c. <u>The Board's out-of-hand disregard of the representative's good faith effort to demonstrate, per Board Rule 47.1 good cause for its untimely filing was arbitrary and capricious</u>

42. In its Determination on Reconsideration of Dismissal and Reinstatement of Appeal letter dated August 3, 2026 (*see,* Exhibit C), the Board acknowledges that a provider's failure to comply with Board procedures *does not automatically* result in its dismissal of the provider's appeal. It points out that:

> "**Upon written motion demonstrating good cause, the Board may reinstate a case dismissed for failure to comply with Board procedures.**" (emphasis added).
>
> (Exhibit C at 3)

Translated, this should appropriately be interpreted to mean that the Board has *discretion* whether to impose the ultimate death knell upon a provider's appeal, that is, a final dismissal. The Board in this instance failed to exercise reasonable discretion by dismissing Plaintiff Hospitals' Group Appeal. First, there was a technical change made some months before to the Board's electronic filing procedures, one of which and is germane to the facts herein is the fact that the previously customary issuance of a Board email to each and every appealing provider known as the "Board's Critical Due Date" email. (*see,* Exhibit B at 1). Plaintiffs' authorized representative, HRS had for a significant period of time prior to the Board action re dismissal expected and did receive this email. Such would trigger the HRS staff to then upload the requisite documents before the imposed filing deadline. It was a process that each HRS staff member charged with filing documents with the Board through its portal knew well, step by step. As noted below (sub-section (d)), the change precipitated by the Board in late 2025 that was not directly communicated to HRS (nor to HRS's knowledge, to any hospital provider or representative) fell by the wayside in this

particular circumstance. In its "Request for Reconsideration" letter of July 9, the authorized representative of Plaintiff Providers goes to great lengths to describe the confusion that arouse at HRS as to mechanics and timing of filing pertinent documents, including a Rule 20 Certification when confronted with the Board's revised filing portal process as well as the twelve day lapse between when it notified the Board that the Group had been fully formed, and receipt of the CDD email that would *in the past* trigger a simultaneous filing of the Rule 20 Certification. On this occasion and given the December, 2025 modified Rule 20, the directives were split; first, HRS notified the Board that the Group had been fully formed, followed twelve days later by the CDD letter.

43. The explanation for failing to file a timely Board Rule 20 Certification (the error which led directly to the dismissal) offered by HRS was quite reasonable and understandable, and could not conceivably demonstrate an intentional disregard for the Board's rules or directives. Further, what amounted to a mere two-week delay in providing the Board with the requisite Board Rule 20 Certification prejudiced no one. Not the Board, and not the agency. And while the Board makes clear that, "Generally, administrative oversight …. will not be considered good cause to reinstate…." (Exhibit C at 3), it is surely a misapplication of that standard to conclude that the factors giving rise to *this* failure to file a timely Rule 20 Certification should be judged as lacking "good cause".

d. <u>The Board failed to disseminate notice of the subtle electronic filing modification to Plaintiffs and Plaintiffs' representative</u>

44. The Board made the false assumption that the electronic filing process at its portal was somehow so subtle as not to require the issuance of any such modification to providers or to their authorized representative. That however serves as another fatal flaw in the Board's reasoning

of the circumstances at hand. Many hospital provider representatives, such as HRS, have been in its trade for decades. If *any* modification of *any* substance is made to the Board electronic filing system, it is the Board's responsibility to send out a mass email to those representatives describing any such modification. Such was not the case in this matter . In the absence of a written notice (or warning) of such a change, no matter how subtle, an error such as that experienced by HRS could reasonably be expected; surely its failure to file a timely Certification while stating in writing the source of the confusion (as set forth in Exhibit B) should in this instance be enough for the Board to have concluded that HRS and its explanation was a demonstration of *good cause.* Obviously, the Board did not fully appreciate the confusion it had set in motion, and refused to acknowledge same. All this leading to a final dismissal of Plaintiffs' CIRP Group appeal, and the extinguishment of the hospitals' data-backed argument that collectively, Plaintiffs were entitled to hundreds of thousands of dollars in additional DSH hospital reimbursement for their efforts in treating DSH hospital patients, specifically, those individuals who are low income or indigent.

e. <u>The Secretary's Actions Violate the APA and Other Authorities</u>

45. Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review of final agency action involving PRRB appeals "…shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the APA. Under the APA, a "…reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Further, a "…reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute[.]" 5 U.S.C. § 706(2)(E).

46. In the view of Plaintiffs, they as well as their authorized representative were compliant with PRRB Board Rules in their appeal, save the one deadline requirement that arouse by virtue of a subtle yet important modification to the Board's electronic filing system.

**<u>Count I</u>**

**Judicial Review Under the Medicare Act and the APA**

**(The Board's Dismissal of the Section 1115 Days "Sub-Issue" was Arbitrary, Capricious, an Abuse of Discretion, Otherwise Contrary to Law, and Unsupported by Substantial Evidence)**

47. Plaintiff incorporates paragraphs 1-46 of this Complaint by reference.

48. The APA prohibits agency action that is "…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "…unsupported by substantial evidence." *Id.* § 706(2)(E).

49. The Board's dismissal of  Plaintiffs' appeal was ultra vires, arbitrary, capricious, an abuse of discretion, and otherwise contrary to the Medicare Act.

**<u>Count II</u>**

**Due Process Violation**

50. Plaintiff incorporates paragraphs 1-49 of this Complaint by reference.

51. It has a property right under the Fifth Amendment of the U.S. Constitution that requires the Secretary and the Secretary's agents to follow their own rules and give pre-deprivation and **fair notice** to the Plaintiff Hospital.

52. By virtue of the Board's failure to give written notice of its modification to the filing portal to Plaintiffs, it failed to carry out its duties effectively to those hospitals it serves, and for the fact that it gave rise to the late filing of the Rule 20 Certification and subsequent appeal dismissal, was an arbitrary and capricious remedy.

**Count III**

**All Writs Act**

53. Plaintiff incorporates paragraphs 1-52 of this Complaint by reference.

54. The DSH payment at issue violated the Medicare Act and APA. Under the All Writs Act, 28 U.S.C. § 1651(a): "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

55. This Court, properly seized of jurisdiction, should issue an order requiring CMS to make proper DSH payment to Plaintiff and pay appropriate underpayment interest thereon under 42 U.S.C. §§ 1395oo(f)(2), 1395g(d) and/or 1395l(j), and 42 C.F.R. § 405.378.

**Count IV**

**Judicial Review Under the Medicare Act and APA**

**(The Board's Dismissal Issue was Arbitrary, Capricious, an Abuse of Discretion, Otherwise Contrary to Law, and Unsupported by Substantial Evidence)**

56. Plaintiff incorporates paragraphs 1-55 of this Complaint by reference.

57. The APA prohibits agency action that is "…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "…unsupported by substantial evidence." *Id.* § 706(2)(E).

58. The Board's dismissal of the DSH Payment – Medicaid Eligible Days issue was arbitrary, capricious, an abuse of discretion, otherwise contrary to the Medicare Act, and unsupported by substantial evidence.

## Count V

### Judicial Review Under the Medicare Act and the APA

### (The Board's Disregard of Plaintiff's Supplemental and Final Position Paper Filings was Arbitrary, Capricious, an Abuse of Discretion, Otherwise Contrary to Law, and Unsupported by Substantial Evidence)

59. Plaintiff incorporates paragraphs 1-58 of this Complaint by reference.

60. The APA prohibits agency action that is "…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "…unsupported by substantial evidence." *Id*. § 706(2)(E).

61. The Board's total disregard of Plaintiff's good cause explanation for its failure to timely file a Rule 20 Certification was arbitrary, capricious, an abuse of discretion, otherwise contrary to the Medicare Act, and unsupported by substantial evidence.

## REQUEST FOR RELIEF

For all of the foregoing reasons, Plaintiff respectfully requests that this Court enter an Order:

a. Ordering the Secretary to remand Plaintiffs' CIRP Group appeal for their 2020 Texas 1115 Waiver Days CIRP GROUP appeal, case No. 24-2269GC in writing to the PRRB, with copy of such writing to legal counsel for Plaintiffs, instructing the PRRB to (1) assert jurisdiction over and reinstate Plaintiffs' CIRP Group appeal No. 24-2269GC, and (2) to issue a letter to Plaintiffs and their intermediary no later than thirty days following the date of remand to the PRRB, with a copy to legal counsel for Plaintiffs, notifying them that the PRRB has asserted jurisdiction and has reinstated Plaintiffs' CIRP Group appeal, and scheduling proceedings on the merits;

b. Grant both Plaintiffs and the MAC up to one-hundred and eighty (180) days to submit any and all additional documentation and data to support their positions at hearing;

c. That this Court shall retain jurisdiction over this case for purposes of enforcement of the Secretary's compliance with this Court's order;

d. That the Court award Plaintiff Hospitals' costs and reasonable attorneys' fees, and for interest; and;

e. That the Court award Plaintiffs any other and further relief the Court deems just and proper.

Dated: September 5, 2026

Respectfully submitted,

ALAN SEDLEY LAW CORPORATION

By: */s/ Alan J. Sedley*
Alan J. Sedley, Esq. Bay # OH0017
18880 Douglas, Suite 417
Irvine, CA 92612
Phone: 818.601.0098
asedley@sedleyhealthlaw.com

*Attorney for Plaintiffs*